**CITY OF NEW BRAUNFELS,**
Texas, Appellant

v.

**STOP THE ORDINANCES PLEASE;
W.W. GAF, Inc., d/b/a Rockin "R"
River Rides; Texas Tubes; Tourist Associated Businesses of Comal County;
Union River, LLC, d/b/a Landa River
Trips; Chuck's Tubes; Waterpark
Management, Inc.; Tri-City Distributors, LP; and Stone Randall Williams,
Appellees**

NO. 03-14-00198-CV

Court of Appeals of Texas,
Austin.

Filed: May 18, 2017

Rehearing Overruled June 5, 2017

Mr. William M. McKamie, McKamie Krueger, L.L.P., 941 Proton Road, San Antonio, TX 78258, for Appellant.

Mr. Jim Ewbank, Cokinos, Bosien & Young, 1210 Nueces Street, Austin, TX 78701, for Appellees.

Before Justices Puryear, Pemberton, and Bourland

## OPINION

Bob Pemberton, Justice

The City of New Braunfels appeals a final judgment from the district court striking down, as unconstitutional, the so-called "Disposable Container Ordinance" (a/k/a "Can Ban") and a portion of the "Cooler and Container Ordinance." The City argues chiefly that the district court lacked subject-matter jurisdiction to decide the legal challenges that have been brought against the ordinances. Although this Court previously rejected jurisdictional arguments raised by the City at earlier junctures in this case, the City's arguments now—which emphasize historical limitations on the power of civil courts to decide challenges to penal laws—differ from those that were the primary focus of the earlier appeals. Based on the Texas Supreme Court's most recent binding precedents regarding limitations on civil court jurisdiction to decide challenges to penal laws, we must reverse and render judgment dismissing the challenges for want of subject-matter jurisdiction.

## BACKGROUND

This appeal arises from the continuation of the underlying disputes and litigation that gave rise to the interlocutory appeals addressed in *Stop The Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919 (Tex. App.—Austin 2010, no pet.) (*STOP I*), and *City of New Braunfels v. Stop The Ordinances Please*, No. 03-12-00528-CV,

2013 WL 692446 (Tex. App.—Austin Feb. 21, 2013, no pet.) (mem. op.) (*STOP II*). As detailed in those opinions, intense public debate regarding the perceived detriment versus benefit attributed to "tubers" on the Guadalupe and Comal Rivers has prompted the New Braunfels City Council to enact a succession of ordinances addressed to those issues in recent years.[1] These ordinances have included what is termed the "Cooler and Container Ordinance," which in relevant part prohibits the possession of "coolers" with a capacity exceeding sixteen quarts "on or in the public waters of the portions of the Guadalupe River and Comal River that lie within the city limits."[2] Most recently, the City Council enacted, and the citizenry later approved by referendum, an ordinance that prohibits the possession of food or beverages in, or use of, a "disposable container" on or in the public waters of the Guadalupe River or Comal River (the "Disposable Container Ordinance," but also popularly known as the "Can Ban").[3] Both ordinances (and others directed to tuber-related issues) have been met with lawsuits in district court alleging principally that the enactments are beyond the City's constitutional and statutory authority. The City challenged the constitutional standing of the plaintiffs to prosecute their

claims, and the district court's rulings on these challenges were in turn the primary subject of the interlocutory appeals.

In *STOP I*, the appeal was from a district-court order granting the City's plea challenging the standing of the plaintiffs in regard to ordinances that included the Cooler & Container Ordinance but not the Disposable Container Ordinance, which had not yet been enacted. The plaintiffs at that time included the current appellees— Stop the Ordinances Please (STOP), " 'an unincorporated association of business owners and other parties interested in the use and enjoyment of the Comal and Guadalupe Rivers which flow within the corporate city limits of the City of New Braunfels' ";[4] Rockin "R" River Rides and Texas Tubes, members of STOP that were outfitters engaged in the business of renting tubes and ice chests for use on the Comal and Guadalupe Rivers; and Stone Randall Williams, an individual who alleged that he had received a citation for violation of the Cooler & Container Ordinance while tubing on the Comal within the City limits.[5] At that juncture, the City had challenged only the sufficiency of the plaintiffs' pleading allegations and did not present evidence in an attempt to negate the facts

---

1. *See generally City of New Braunfels v. Stop The Ordinances Please*, No. 03-12-00528-CV, 2013 WL 692446 (Tex. App.—Austin Feb. 21, 2013, no pet.) (mem. op.) (*STOP II*); *Stop The Ordinances Please v. City of New Braunfels*, 306 S.W.3d 919 (Tex. App.—Austin 2010, no pet.) (*STOP I*).

2. *See Stop I*, 306 S.W.3d at 922–23. The Cooler & Container Ordinance is currently codified at City of New Braunfels, Mun. Code § 86-14(a)(1), and provides, as applicable here:

   (a)(1)  It shall be unlawful for anyone to use, carry, possess or dispose of a cooler that has a capacity greater than sixteen (16) quarts on or in the

public waters of the portions of the Guadalupe River and Comal River that lie within the city limits and are defined herein. . . .

3. The Disposable Container Ordinance is currently codified at City of New Braunfels, Mun. Code § 86-14(a)(2) and provides in relevant part:

   (a)(2)  It shall be unlawful for anyone to use, carry or possess food or beverages in a disposable container on or in the public waters of the Guadalupe River or Comal River. . . .

4. *Stop I*, 306 S.W.3d at 923.

5. *Id.* at 924–25.

alleged.[6] We held that the outfitters had sufficiently pleaded particularized injury from the Cooler & Container Ordinance distinct from that incurred by the general public to establish their constitutional standing to bring their claims challenging the cooler-size restriction.[7] In turn, we held that STOP had sufficiently pleaded its associational standing.[8] Accordingly, we held that the district court had jurisdiction to adjudicate the challenge by STOP and the outfitters to the cooler-size restriction in the Cooler & Container Ordinance, and we reversed and remanded the case as to that claim. However, we affirmed the district court's judgment in all other respects, including the dismissal of all of Williams's claims for want of subject-matter jurisdiction.[9]

After the case was remanded to district court, the surviving plaintiffs filed an amended petition that incorporated their claims challenging the cooler-size restriction in the Cooler & Container Ordinance, added largely parallel claims challenging the Disposable Container Ordinance (which had been enacted in the meantime), and attempted to plead an alternative standing theory whereby the plaintiffs purported to restrain the City from "illegally expending taxpayer funds to exert its police powers to enforce city ordinances that violated the Constitution of the State of Texas."[10] A petition in intervention was also filed by the remaining appellees in the present case—Union River LLC d/b/a Landa River Trips; Chuck's Tubes; Waterpark Management, Inc.; Tri-City Distributors, L.P.; Tourist Associated Businesses

of Comal County; and (again) Stone Randall Williams—who alleged claims and jurisdictional theories similar to those asserted by the remaining plaintiffs.[11] In response, the City interposed pleas to the jurisdiction challenging the constitutional standing of all plaintiffs to assert their claims concerning the Disposable Container Ordinance and challenging the intervenors' standing to assert any of their claims.[12] As in *STOP I*, the City challenged only the sufficiency of the pleading allegations and did not present evidence to negate the facts alleged, although the claimants filed evidence in response to the plea.[13] Following a hearing, the district court overruled the City's pleas to the jurisdiction in their entirety, and this Court in *STOP II* affirmed this ruling except as to the claims asserted by Williams. As to Williams, we reversed and remanded to provide him with an opportunity to replead.[14]

After the case was remanded to district court, the parties conducted discovery and then presented competing motions for summary judgment with evidence that included affidavits and deposition excerpts. The City's summary-judgment grounds included both new challenges to jurisdiction and challenges on the merits. After a hearing, the district court signed an order granting appellees' motion for summary judgment, denying the City's motion for summary judgment, granting a permanent injunction, and rendering judgment awarding declaratory relief and attorney's fees,

6. *Id.*

7. *Id.* at 927–28.

8. *Id.* at 931–32.

9. *Id.* at 931.

10. *See STOP II*, 2013 WL 692446, at *3.

11. *See id.* at *3–4.

12. *See id.* at *4.

13. *See id.*

14. *See id.* at *12.

expenses, and costs against the City. In its judgment, the district court declared:

- The "Disposable Container Ordinance" and that part of the "Cooler Ordinance" "that limits the size of coolers" "unconstitutional and void"; and
- The City "is illegally expending taxpayer funds to enforce the Ordinances."

The district court also permanently enjoined the City from enforcing, spending public funds, or collecting fines or any other penalties as to the Disposable Container Ordinance and the cooler-size restriction in the Cooler & Container Ordinance. This appeal followed.

## ANALYSIS

■■■ In the City's first issue, it again challenges—albeit while emphasizing limitations different than the standing issues addressed in *Stop I* and *Stop II*—whether the district court possessed subject-matter jurisdiction over appellees' claims challenging the validity of the Disposable Container Ordinance and the cooler-size restriction in the Cooler & Container Ordinance. Whether a court has subject-matter jurisdiction is a question of law that we review de novo,[15] and "[t]he burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction."[16] In the procedural posture of this appeal from a final summary judgment, we consider the parties' evidence to the extent necessary to resolve the challenged jurisdictional facts,[17] taking as true all evidence favorable to appellees and indulging every reasonable inference and resolving any doubts in their favor.[18]

■■■ The jurisdictional challenge that the City now emphasizes is based on long-standing principles that generally permit Texas courts to adjudicate challenges to the validity of penal enactments only in the context of criminal proceedings.[19] This limitation derives historically from the traditional constraints on the power of courts of equity relative to courts of law, and more specifically from limits on equity jurisdiction to enjoin enforcement of the criminal law.[20] The underlying concept is that the

---

15. *Texas Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

16. *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012); *see, e.g., Ex parte Springsteen*, 506 S.W.3d 789, 798 n.50 (Tex. App.—Austin 2016, pet. filed) (citing *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010) (per curiam)).

17. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000); *see also Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012) (describing plea-to-the-jurisdiction practice in Texas when challenge is to existence of jurisdictional facts); *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 719 (Tex. App.—Austin 2009, no pet.) (same). In contrast, because the City's challenges in its pleas to the jurisdiction in the preceding interlocutory appeals were limited to the sufficiency of the plaintiffs' pleadings, we took as true the jurisdictional facts the plaintiffs pled and liberally construed them with an eye to their intent. *See STOP II*, 2013 WL 692446, at *5 (describing applicable standard of review when plea to jurisdiction is limited to challenge to sufficiency of the pleadings).

18. *Miranda*, 133 S.W.3d at 227–28; *see Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 513 (Tex. App.—Austin 2010, no pet.) (describing standard of review when considering jurisdictional evidence).

19. *See, e.g., State v. Morales*, 869 S.W.2d 941, 943–44 (Tex. 1994); *Passel v. Fort Worth Indep. Sch. Dist.*, 440 S.W.2d 61, 63 (Tex. 1969); *City of Austin v. Austin City Cemetery Ass'n*, 87 Tex. 330, 28 S.W. 528, 529 (1894).

20. *See, e.g., Morales*, 869 S.W.2d at 944 (citing John Norton Pomeroy, 1 Pomeroy's Equity Jurisprudence 509–10 (Spencer W. Symons ed., 5th ed. 1941)); *State v. Logue*, 376 S.W.2d 567, 569–70 (Tex. 1964).

opportunity to raise challenges to the validity of a penal statute as a defense to prosecution after committing a violation is ordinarily considered an "adequate" remedy at law, to the exclusion of equitable remedies and jurisdiction.[21] The Texas Supreme Court has also justified the limitation as a means of avoiding conflicting decisions by the two high courts in Texas's bifurcated judicial system.[22] And while historically rooted in the limitations on equity jurisdiction, the same principle has been held to limit jurisdiction over challenges to penal enactments brought under the Uniform Declaratory Judgments Act (UDJA), as the UDJA does not confer or alter the trial court's subject-matter jurisdiction except with respect to sovereign immunity, a distinct and independent jurisdictional limitation.[23]

■ There is no dispute that both the Disposable Container and Cooler & Container ordinances are considered to be "penal" in nature—any person who violates the challenged prohibitions in the ordinances commits a misdemeanor offense and is subject to a fine.[24] Nor is there any question that appellees' challenges to the ordinances, which seek equitable and declaratory relief, would be subject to the aforementioned limitations on equity jurisdiction. But while acknowledging the general rule that would displace equity jurisdiction over their challenges, appellees

---

21. *See, e.g., Passel,* 440 S.W.2d at 63 ("The underlying reason for this rule is that the meaning and validity of a penal statute or ordinance should ordinarily be determined by courts exercising criminal jurisdiction. When these questions can be resolved in any criminal proceeding that may be instituted and vested property rights are not in jeopardy, there is no occasion for the intervention of equity. A person may continue his activities until he is arrested and then procure his release by showing that the law is void." (citing *Austin City Cemetery Ass'n,* 28 S.W. at 528)); *Logue,* 376 S.W.2d at 570 (terming the limitation "merely a restatement of the more general principles of equity" that looks to whether "there is an adequate remedy at law by setting up the defense of unconstitutionality of the statute in question in a criminal proceeding").

22. *See, e.g., Morales,* 869 S.W.2d at 947–48 (noting "pragmatic justification, especially in Texas, where we have separate and distinct jurisdiction allocated by the Texas Constitution to our civil and criminal courts, including two courts of last resort," and the resulting potential for conflicting decisions); *Logue,* 376 S.W.2d at 569 (citing "dual systems of courts in this state—civil and criminal").

23. *See Morales,* 869 S.W.2d at 947 (observing that UDJA "is merely a procedural device for deciding cases already within a court's jurisdiction," such that "[f]or the same reasons

that equity courts are precluded from enjoining the enforcement of penal statutes, neither this court, nor the courts below, have jurisdiction to render a declaratory judgment...."); *cf. Texas Dep't of Transp. v. Sefzik,* 355 S.W.3d 618, 622 & n.3 (Tex. 2011) (explaining that UDJA implicitly waives sovereign and governmental immunity with respect to challenges to validity of statutes and ordinances by "expressly requir[ing] joinder of the governmental unit" in those actions).

24. *See Consumer Serv. All. of Tex., Inc. v. City of Dallas,* 433 S.W.3d 796, 803 (Tex. App.—Dallas 2014, no pet.) (explaining that "[t]he basic test as to whether a law is penal is whether the wrong sought to be redressed is a wrong to the public or a wrong to an individual. Public wrongs involve a violation of public rights and duties, which affect the whole community, considered as a community, and are considered crimes; whereas individual wrongs are infringements of private or civil rights belonging to individuals, considered as individuals, and constitute civil injuries." (citing *Huntington v. Attrill,* 146 U.S. 657, 668–69, 13 S.Ct. 224, 36 L.Ed. 1123 (1892))); *see also Trop v. Dulles,* 356 U.S. 86, 96, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) ("In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute. If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal.").

bring their claims under color of a long-recognized exception that permits equitable relief (and by extension declaratory relief under the UDJA) where a penal enactment is (1) unconstitutional; and (2) said to threaten "irreparable injury to vested property rights."[25] We focus initially on the second requirement.

"Property rights are created and defined by state law,"[26] and "include actual ownership of real estate, chattels, and money."[27] "A right is 'vested' when it 'has some definitive, rather than merely potential existence.'"[28] Thus, appellees would unquestionably possess a "vested property right" in the lawful possession of any disposable containers or coolers subject to the ordinances that they might own, either personally or (in the case of the businesses who are appellees) as inventory.[29] But this right does not automatically translate to a "vested property right" to use said property a particular way or in a particular location,[30] although these activities may be aspects of broader *personal* rights or liberties.[31]

This Court recognized as much in both *STOP I* and *STOP II*. Although the primary focus of the parties' arguments and our opinions was the constitutional standing of the claimants,[32] we were also called upon to decide whether the district court had equity jurisdiction to decide Williams's claims, in light of the general rule prohibit-

---

25. *See, e.g., Morales*, 869 S.W.2d at 945 (quoting *Passel*, 440 S.W.2d at 63). As discussed below, a penal enactment's validity may also be litigated indirectly in the context of a civil proceeding having some independent jurisdictional basis, such as a challenge to an administrative rule or decision that implements the enactment. *See id.* at 945–46 (describing *Passel* as falling into this category). Appellees do not claim any such independent jurisdictional basis here.

26. *Consumer Serv. All. of Tex.*, 433 S.W.3d at 805 (citing *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Reese v. City of Hunter's Creek Vill.*, 95 S.W.3d 389, 391 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)).

27. *Id.* (citing *Reese*, 95 S.W.3d at 391); *see also City of Corpus Christi v. Maldonado*, 398 S.W.3d 266, 270 (Tex. App.—Corpus Christi 2011, no pet.) (" '[P]roperty right' refers to any type of right to specific property, including tangible, personal property.").

28. *Consumer Serv. All. of Tex.*, 433 S.W.3d at 805 (quoting *City of Hous. v. Guthrie*, 332 S.W.3d 578, 597 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

29. *Id.* at 806 (stating that business has "a vested property right in the lawful possession of physical items of inventory that it owns" (citing *Maldonado*, 398 S.W.3d at 270; *Morrow v. Truckload Fireworks, Inc.*, 230 S.W.3d 232, 238 (Tex. App.—Eastland 2007, pet. dism'd))).

30. *See id.* at 805–06 (citing *Morrow*, 230 S.W.3d at 238, 240).

31. *See Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 82–88 (Tex. 2015) (discussing broader range of economic rights, encompassing but not limited to acquisition and possession of property, protected under court's substantive-due-process analysis); *id.* at 92–100 (Willett, J., concurring) (describing underlying rights in terms of "economic liberty"); *Morrow*, 230 S.W.3d at 238 ("The concept of personal rights is broader [than "vested property rights"] and includes the right to conduct a specific activity.").

32. *See STOP II*, 2013 WL 692446, at *6 ("By alleging that the Cooler & Container Ordinance restricted their use of their property, caused them to incur additional expenses, and damaged or destroyed their market for larger *cooler* rentals within the City limits, the Outfitter Plaintiffs have demonstrated the required actual, concrete, and particularized infringement of their legally protected interests necessary for standing."); *Stop I*, 306 S.W.3d at 929 (explaining that "plaintiff is not required to allege the deprivation of a 'vested right' constituting a due-process violation to demonstrate the requisite infringement of a 'legally protected interest'" necessary for constitutional standing).

ing equitable challenges to penal laws, where he had allegedly been cited for violating each ordinance and faced prosecution.[33] We held in each case that Williams had failed to invoke the exception to the general rule because he had not alleged or proven irreparable injury to any vested property right from the City's enforcement of the ordinances' criminal penalties against him.[34] While Williams might have possessed a vested property right in the items themselves, the decisive consideration was that "Williams [had] no vested property right in carrying a cooler of a particular size into the Comal River or committing any of the other acts prohibited by the ordinance," nor any "vested property right in transporting a 'disposable container' into the rivers." [35]

Moreover, applying similar reasoning, this Court has also held that a fireworks vendor had no "vested property right" in the sale of its wares, so as to permit it to bring a declaratory-judgment action challenging a countywide burn ban (in Comal County, it happens) that had criminalized the vendor's sale, distribution, or use of fireworks.[36] In that case, *Mr. W. Fireworks, Inc. v. Comal County*, the Court relied on authorities that included our sister court's opinion in *Morrow v. Truckload Fireworks, Inc.*[37] In *Morrow*, the Eastland

Court of Appeals addressed a fireworks company's suit for injunctive relief challenging a county's ban on the outdoor use of fireworks.[38] The company argued that it had a "vested property right in the operation of its fireworks business," so as to support the trial court's jurisdiction over its claims.[39] The company's allegations included that the ban would destroy its business and cause an unrecoverable loss of income, and the evidence showed that the company had spent over $300,000 on inventory, over $25,000 for advertising, and over $25,000 for leases and associated costs for locations within the county.[40] Although our sister court recognized that the company had a property right in the physical items that it owned such as its inventory, it determined that the trial court did not have jurisdiction over the claims challenging the validity of the ban. In reaching its conclusion, our sister court distinguished personal rights from property rights, noting that the "concept of personal rights is broader and includes the right to conduct a specific activity" and that the "right to conduct an activity, such as using property for a specific purpose, does not equate that personal right with a vested property right." [41] The court concluded that "tremendous financial loss," even though tangible and significant, was "insufficient to constitute a vested property right because

33. *See STOP II*, 2013 WL 692446, at *8 (explaining that Williams was relying on "pleadings and proof that he is in jeopardy of being cited for violating the Disposable Container Ordinance and that he, in fact, has already been cited"); *STOP I*, 306 S.W.3d at 931 ("Williams alleged that he was cited for violating the Cooler & Container Ordinance. Williams asserts that the prospect of a fine or sanctions for his alleged violation confers upon him standing to challenge the ordinance in this proceeding.").

34. *See STOP II*, 2013 WL 692446, at *8 (citing *STOP I*, 306 S.W.3d at 931).

35. *See id.*

36. *See Mr. W. Fireworks, Inc. v. Comal Cty.*, No. 03-06-00638-CV, 2010 WL 1253931, 2010 Tex. App. LEXIS 2384 (Tex. App.—Austin Mar. 31, 2010, no pet.) (mem. op.).

37. *See id.* at *7–8, 2010 Tex. App. LEXIS 2384 at *20–21.

38. *See Morrow*, 230 S.W.3d at 234.

39. *See id.* at 238.

40. *Id.* at 239.

41. *Id.* at 238.

it represents losses due to restrictions on personal rights."[42] The court also noted that the fireworks ban did not prohibit the company from selling fireworks nor require it to surrender its inventory.[43]

Although Williams remains a party, appellees do not contend at this juncture that he has suffered any irreparable injury to his vested property rights, so as to come within the exception. They rely instead on asserted injury to the "vested property rights" of the appellees that are engaged in the business of selling "disposable containers," selling or renting coolers, or otherwise providing goods or services to river-bound customers. Their theory is not that they possess a "vested property right" to sell their wares, per se, that has been infringed by the ordinances, but that the ordinances inflict a broader range of economic harm to the value of their inventory and other business assets. Appellees emphasize evidence to the effect that the value of the businesses, real property, and inventory are tied to their locations near the rivers and the level of consumer demand from river-bound customers. They point to proof of lost sales of the coolers or disposable containers that the ordinances restrict, "loss of a customer base that diminishes their ability to sell or rent those items that are not otherwise restricted by the ordinance," and "diminish[ed] value of the real property in that the restrictions are effective in driving away tourists, the mainstay of [appellees]' trade."

Appellees' arguments emphasize a historical relationship between the requirement that a penal enactment threaten "irreparable injury to vested property rights" and the perceived "adequacy" of the alternative remedy of violating the enactment and raising invalidity as a defense in the criminal prosecution that follows.[44] For example, threatened injury from the prosecution in itself, such as the temporary interruption of one's use of property, has been considered remediable by a successful defense, so as to not meet the requirement.[45] In contrast, the requirement has been deemed met in situations where the government's enforcement of the penal law in question entails irremediable physical destruction or damage to real or personal property that would occur before the challenge could be litigated in a criminal proceeding.[46] Appellees, again, do not com-

**42.** *Id.* at 239–40 (concluding that plaintiff "[had] not identified a vested property right but, at best, [had] only identified a personal right to sell and display fireworks" and that "a property owner has no absolute right to use his property for a particular purpose").

**43.** *See id.* at 240.

**44.** *See Logue,* 376 S.W.2d at 572 (noting that "the requirement of property rights being affected is related to adequacy of remedy at law (by setting up the unconstitutionality of the statute in a defense to criminal proceedings)").

**45.** *See id.* (regarding attempted injunctive challenge to penal permitting statute brought by trucker subject to the statute, concluding "[t]here is nothing in the law which will result in any irreparable injury to his truck or his business. The mere fact that Williamson's use of his truck will be interfered with by an arrest and prosecution for failure to have a permit ... will not entitle Williamson to an injunction.").

**46.** *See id.* at 571 (citing, with approval, *Neal v. Boog-Scott,* 247 S.W. 689, 693–94 (Tex. Civ. App.—Beaumont 1923, no writ) (injunction restraining penal law mandating dipping of cattle where claimant had alleged the dip was poisonous and would cause cattle injury), *Bielecki v. City of Port Arthur,* 12 S.W.2d 976, 977–78 (Tex. Comm'n App. 1929, judgm't adopted) (injunction restraining penal law outlawing dance halls in certain areas and providing for their summary destruction following owner's arrest), and *Adams v. Antonio,* 88 S.W.2d 503, 507 (Tex. Civ. App.—Waco 1935, writ ref'd) (injunction restraining destruction of pinball machines, but not prosecution, under penal ordinance that outlawed "gaming tables")).

plain of this sort of physical destruction or damage to their property incident to the City's enforcement of the ordinances, nor of any direct limitations imposed on their sales of that property. Their arguments rest, rather, on a line of cases holding the requirement to be met based on various forms of economic harm to a business that are attributed to a penal law, coupled with a perceived inability of the business to challenge the law.

This line of cases originated with an 1894 decision of the Texas Supreme Court, *City of Austin v. Austin City Cemetery Association.*[47] That case involved a suit for injunction brought by a cemetery to challenge the validity of a penal ordinance that had restricted permissible locations of burials in a manner that had excluded the cemetery's property.[48] While acknowledging that "as a general rule the aid of a court of equity can not be invoked to enjoin criminal prosecutions," the supreme court observed that "[t]his rule is ... subordinate to the general principle that equity will grant relief when there is not a

plain, adequate, and complete remedy at law, and when it is necessary to prevent an irreparable injury."[49]

The supreme court determined that the ordinance caused the cemetery "irreparable injury" because "the effect of the ordinance is such that if its enforcement be not restrained it may result in a total destruction of the value of [the cemetery's] property for the purpose for which it was acquired."[50] It further held that the remedy of violating the ordinance and raising invalidity as a defense was inadequate under the circumstances because the ordinance effectively made that remedy unavailable. While suggesting that this would have been the cemetery's remedy had the ordinance proscribed only the cemetery's burying of a body on its property, the court emphasized that the ordinance went further to sanction any person who "cause[d] to be buried, or in any manner aid or assist in the burial," thereby deterring the customers whose participation would be essential to the cemetery's violation of the ordinance.[51] "[T]o deny a remedy in a

---

47. 28 S.W. 528.

48. *See id.* at 529–30.

49. *Id.* at 529.

50. *Id.*

51. *See id.* at 529–30. The court explained:

No one, we apprehend, without some considerable inducement will do an act which may cause him to be arrested and prosecuted, however clear he might be in his own mind that the act constituted no violation of the criminal law. A criminal prosecution is unpleasant to all people who have due respect for the law, and almost necessarily involves inconvenience and expense. As long as the ordinance remains undisturbed it acts in terrorem, and practically accomplishes a prohibition against the burial of the dead within the limits of the city of Austin, save in the excepted localities. Under these conditions, who would venture to bury, or be concerned in burying, a dead

body in appellee's ground, or who would purchase a lot in its cemetery? Suppose a city, not having the power under its charter to do so, should pass an ordinance prohibiting the sale of butcher's meat in a certain locality; and suppose it should also prohibit any one from selling meat to be there sold or from buying in the prohibited place. The ordinance would be void, but could any one say that the business of a market man in the locality might not be effectually destroyed by it? Under such circumstances, we are of opinion he should have the right to proceed against the corporation to enjoin its enforcement. If a penalty was denounced against no one but the market man who should sell, it would seem that his remedy would be to proceed with his business and defeat any prosecution that should be brought against him for the infraction of the void ordinance. But to deny a remedy in a court of equity in the case first supposed, or in the present case analogous to it, would be, we think, to disregard the funda-

court of equity" under such circumstances, the supreme court held, "would be ... to disregard the fundamental principle upon which such courts are established." [52]

Subsequently, in a 1958 case, *Smith v. Decker*, the Texas Supreme Court reached a similar holding with respect to an injunctive claim challenging a penal law requiring bail bondsmen practicing in certain geographic areas to obtain a license from the State.[53] The law had the effect, even in the absence of a pending prosecution, of preventing the plaintiffs (unlicensed bail bondsmen in a geographic area subject to the law) from conducting their business, as local authorities would no longer approve the bonds they signed as sureties.[54] Citing the *Slaughter House* cases, the supreme court observed "[t]hat a right to earn a living is a property right within the meaning of our Constitution was early established by the United States Supreme Court ... and a person cannot be deprived of it by simple mandate of the legislature." [55] It then equated the circumstances created by the law to those in *Austin City Cemetery Association*, citing that case for the proposition that "if a city ordinance be void, and even though the city was not immediately seeking to enforce [the ordinance] through criminal proceedings, when the facts in the record show that the right and privilege of using their property for cemetery purposes was destroyed or im-

paired by virtue of the existence of the ordinance," an injunction would issue.[56] It went on to hold that the suit came within the rule that "courts of equity may be resorted to for the purpose of enjoining the enforcement of a criminal statute or ordinance when same is void and when its enforcement invades a vested property right of the complainant." [57] The court reasoned that "[a]ppellants having a vested property right in making a living, subject only to valid and subsisting regulatory statutes, and being prevented from performing their business otherwise lawful but for the statute in question, we believe that we are permitted under the rule ... to order the issuance of the injunction." [58]

Relying on *Austin City Cemetery Association*, some of our sister courts have since held that courts have jurisdiction to entertain equitable or declaratory claims challenging the constitutionality of penal laws when predicated on somewhat lesser economic harms to a business, such as the inability to sell a particular product or at a particular location, at least where the law (as in *Austin City Cemetery Association*) proscribes conduct of both the business and its customers. These cases have included a challenge brought by the owner of a sexually oriented business to local penal regulations that effectively banned possession or consumption of alcoholic beverages in his establishment,[59] a chal-

---

mental principle upon which such courts are established.

**52.** *Id.* at 530.

**53.** *Smith v. Decker*, 158 Tex. 416, 312 S.W.2d 632, 633–34 (1958).

**54.** *See id.*

**55.** *Id.* at 633 (citing 83 U.S. 36, 16 Wall. 36, 21 L.Ed. 394 (1873)).

**56.** *See id.* at 634 (citing *Austin City Cemetery Ass'n*, 28 S.W. at 529–30).

**57.** *Id.*

**58.** *Id.*

**59.** *See Robinson v. Jefferson Cty.*, 37 S.W.3d 503, 508–09 (Tex. App.—Texarkana 2001, no pet.) ("Robinson's [(the business owner's)] summary judgment evidence shows that his establishment suffers an adverse economic impact from the enforcement of the regulation. Customers generally consume alcoholic beverages while being entertained at the adult cabaret. His business loses sales on 'set ups.' Most importantly, the County admits that cus-

lenge brought by "owners of tobacco accessory and novelty shops" against a penal ordinance banning sale or use of "illegal smoking paraphernalia" that criminalized ordinary pipes used to smoke tobacco,[60] a challenge brought by a company that manufactured, sold, and operated "trench burners" against a City of Austin penal ordinance that banned the devices' construction, operation, or use within city limits,[61] and a milk vendor's challenge to a municipal penal ordinance that specified minimum fat content for "Grade A" milk

in a manner making it uneconomical for the business to sell that product there.[62]

In appellees' view, this line of cases "demonstrate[s] that, for the past 100 years, Texas courts have found that an adverse economic impact on a business constitutes harm to a vested property right," at least in circumstances where the business lacks an adequate remedy through criminal proceedings due to the deterrent effect on customers. In this regard, they suggest that the key consideration in *Austin City Cemetery Association*

tomers who consume alcoholic beverages in Robinson's establishment are subject to arrest and prosecution. The County has admitted that Robinson has a vested property right in his establishment.... We conclude that Robinson has shown that the remedy of defense to a prosecution is not an adequate remedy to him to challenge the validity and constitutionality of the County's regulation. Cases arising from facts similar to those in this case, where the penal regulation or ordinance may be enforced against not only the business owner but also his customers, have held that defense of a prosecution is not an adequate remedy at law.").

**60.** *See Maldonado*, 398 S.W.3d at 268, 270–71 ("The ordinances prohibit the Merchants from selling pipes traditionally used for smoking tobacco, prohibit prospective customers from purchasing pipes of this type, and at least one merchant's property was seized because it was allegedly illegal under the new ordinance. In addition, the Merchants presented evidence in the trial court that their businesses were being severely curtailed by the ordinances. Accordingly, we hold that the Merchants demonstrated irreparable harm to a vested property right resulting from the enforcement of the penal ordinances, and that the trial court had jurisdiction to enter its temporary-injunction order even if prosecution was imminent as the City maintains.").

**61.** *See Air Curtain Destructor Corp. v. City of Austin*, 675 S.W.2d 615, 617–18 (Tex. App.— Tyler 1984, writ ref'd n.r.e.) ("From our analysis of the facts here, we have concluded that this case falls within the reach of *City of Austin v. Austin City Cemetery Association* ... The plain language of the ordinance de-

nounces 'the use' of the trench burner as well as the construction and operation thereof. It appears that the circumstances here presented render it highly unlikely that the ordinance could ever be tested by Air Curtain [ (the manufacturer, seller, and operator of the devices) ] by proceeding to sell, use, or operate a trench burner in violation of the ordinance. Thus, if Air Curtain under this record will suffer irreparable injury to its property rights by the continuing enforcement of the ordinance, it is entitled to the injunctive relief sought if the ordinance is void. We conclude that Air Curtain does have valuable vested property rights to manufacture, sell and operate the trench burners in the prohibited area, which rights will be irreparably damaged by the continued enforcement of the ordinance.").

**62.** *See Cabell's, Inc. v. City of Nacogdoches*, 288 S.W.2d 154, 159–60 (Tex. Civ. App.— Beaumont 1956, writ ref'd n.r.e.) ("[T]his milk is property and the right to sell this milk ... is one of the rights included within, or incidental to, the plaintiff's ownership of said milk.... It is self-evident that the right of property includes not only that of owning and possessing it, but also of selling and transferring it to others.... It was this right of property which the Supreme Court enforced in [*Austin City Cemetery Association*].... We conclude ... that the plaintiff's right to sell its milk in the defendant city is a vested one within the strict equitable meaning of that term as used in [*Austin City Cemetery Association*].''); *id.* at 161–62 (concluding that plaintiff lacked adequate remedy at law because of deterrent effects of ordinance on retail dealers who would otherwise sell business's milk).

was not the existence of a "property right" or "vested property right" on the part of the cemetery, per se, but the cemetery's inability to obtain remedy for its economic injury except through its suit. They point to a subsequent Texas Supreme Court explanation of the case as having "rested on the premise that unless the courts of equity took cognizance of the cemetery's rights, there would be no way to ever test the constitutionality of the ordinance."[63] And the businesses find themselves in a parallel situation here, appellees insist, because they are suffering economic harm from the ordinances—including having "all of [their] inventory in disposable containers ... rendered worthless," which they equate to the cemetery property—yet cannot unilaterally violate the ordinances through their business activities in order to test their validity, and it is unlikely that their customers (or anyone else) will do so due to the deterrent effects of the criminal penalties. Appellees add that this deterrent effect on the businesses' customers and resultant unlikelihood of a challenge distinguishes this case from this Court's decision in *Mr. W. Fireworks*, emphasizing this Court's conclusion that the burn ban

there imposed penalties only against the fireworks vendors and not its customers.[64] And while appellees acknowledge that the *Morrow* decision on which this Court relied had involved a penal burn ban that applied solely to the fireworks companies' customers,[65] similar to the ordinances here, appellees insist that the case was a wrongly decided outlier.

But as the City urges, appellees must also grapple with the implications of the Texas Supreme Court's intervening decision in *State v. Morales*. That case concerned a 1990s-era suit for injunctive and declaratory relief seeking to invalidate, on constitutional grounds, Texas's criminal law proscribing sodomy.[66] The plaintiffs, who alleged they engaged in conduct prohibited by the statute, claimed injury in the form of stigmatization as well as harm to employment prospects due to the statute's existence,[67] and the State apparently stipulated generally that the statute resulted in limited job choices, discrimination, and psychological harm for the plaintiffs.[68] However, it was undisputed that the statute had never been enforced, nor likely would be, and thus there was no possibility that the plaintiffs could bring their chal-

---

**63.** *Logue*, 376 S.W.2d at 569. We also note in this regard that the *Austin City Cemetery Association* court concluded its analysis of the jurisdictional issue by citing a Georgia case for the proposition that " '[w]here it is manifest ... that a prosecution and arrest is threatened for an alleged violation of city ordinances for the sole purpose of preventing the exercise of *civil rights* conferred directly by law, injunction is the proper remedy to prevent injury to the party thus menaced.' " *Austin City Cemetery Association*, 28 S.W. at 530 (quoting *City of Atlanta v. Gas Light Co.*, 71 Ga. 106, 126 (emphasis added)). The supreme court subsequently quoted the same language in its *Decker* decision, the case holding that bail bondsman could sue for injunctive relief against a licensing statute that impinged their "vested property rights" in making a living. *See Decker*, 312 S.W.2d at 634 (quoting *Austin City Cemetery Ass'n*, 28

S.W. at 530 (quoting *City of Atlanta*, 71 Ga. at 126)). *See also infra* note 75.

**64.** *Mr. W. Fireworks, Inc.*, 2010 WL 1253931, at *8 n.7, 2010 Tex. App. LEXIS 2384, at *23 n.7 ("In this case, the County Order did not impose penalties on customers who bought fireworks. Thus, Mr. W. could have violated the ordinance by selling fireworks to a customer without having to expect or compel the customer to also face criminal penalties.").

**65.** *See Morrow*, 230 S.W.3d at 240.

**66.** *See Morales*, 869 S.W.2d at 942.

**67.** *See id.* at 943.

**68.** *See id.* at 953–54 (Gammage, J., dissenting).

lenge as a defense to a criminal prosecution following violation.[69] Thus, the key issues related to whether the character of the plaintiffs' alleged injuries and the absence of a remedy at law sufficed to establish jurisdiction over their claims in the face of the traditional principles limiting equity jurisdiction over penal statutes.

The *Morales* court began by emphasizing "[t]he long-standing limitation on equity jurisdiction" that constrains power to construe a criminal statute only to "narrow circumstances." [70] The court posited that "[t]here are four types of cases in which a party might seek relief from an equity court based on the alleged unconstitutionality of a criminal statute:"

(1) the statute is enforced and the party is being prosecuted;

(2) the statute is enforced and the threat of prosecution is imminent, although the party has yet to be prosecuted;

(3) there is no actual or threatened enforcement of the statute and the party does not seek an injunction against its enforcement, but the statute is nonetheless integrally re-

lated to conduct subject to the court's equity jurisdiction; or

(4) there is no actual or threatened enforcement of the statute and no complaint of specific conduct remediable by injunction.[71]

In the first two categories of cases, according to the *Morales* court, it was "well settled" that equity courts could intervene only if "the statute is unconstitutional and its enforcement will result in irreparable injury to vested property rights"; otherwise, a person's remedy is to "continue his activities until he is arrested and then procure his release by showing that the law is void." [72] It further asserted that the requisite "irreparable harm to property rights must flow from attempted *enforcement* of the statute." [73] In this connection, the court also characterized *Austin City Cemetery Association* as turning on the "potential enforcement" of the ordinance there against the cemetery owner, as opposed to the customers.[74]

The supreme court also rejected any notion that injury to personal rights, as opposed to "vested property rights," sufficed as a basis for a civil court's equity jurisdiction over criminal statutes.[75] Per-

---

69. *See id.* at 943, 947.

70. *Id.* at 944.

71. *Id.* at 944–45 (formatting added).

72. *Id.* at 945 (quoting *Passel*, 440 S.W.2d at 63).

73. *Id.* at 943 n.6.

74. *See id.* at 944 n.7 ("[A]ll of the potential 'injuries' discussed by the court in *Austin City Cemetery Ass'n* flow from potential *enforcement* of the statute.... If the cemetery owner, or as in the case of the hypothetical discussed ... a butcher, faced no threat of prosecution whatsoever, the ordinance would have no in terrorem effect.").

75. *See id.* at 945–46. In this regard, it may also be significant that the *Morales* court

pointedly referenced Austin City Cemetery Association's "injuries" in quotes, *see id.*, as if to question whether that injury or harm would in fact suffice under the *Morales* court's understanding of injury to "vested property rights." Such an inference tends to be confirmed by the context in which the reference appears. The *Morales* court was responding to arguments by the dissent, in reliance on its reading of *Austin City Cemetery Association* and *Passel*, that existing Texas law permitted the assertion of equity jurisdiction predicated on injury to personal rights. *See id.; cf. id.* at 949–51 (Gammage, J., dissenting, joined by Phillips, C.J., and Doggett, J., & Spector, J.). In attempting to distinguish *Austin City Cemetery Association*, the *Morales* court began by observing that "*Austin City Cemetery Ass'n* ... cites to authority requiring injury to property," though does not go as far as to assert that *Austin City Cemetery Association* itself in-

sonal rights could suffice, the court explained, only in the third category of cases, where the validity of a criminal statute is litigated indirectly in the context of a civil proceeding having some independent jurisdictional basis, such as a challenge to an administrative rule or decision that implements the enactment.[76]

The *Morales* court classified the plaintiffs' claims there as falling within the fourth category, where it concluded "equity jurisdiction is plainly lacking." [77] It dismissed any concern that the claimants lacked any remedy at law due to the unavailability of criminal proceedings, asserting that "equity jurisdiction does not rise or fall solely on the basis of the adequacy of their remedy at law." [78] In fact, the court made that concept a primary theme of the entire opinion, beginning with its first sentence: "Equity jurisdiction does not flow merely from the alleged inadequacy of a remedy at law, nor can it originate solely from a court's good intentions to do what seems 'just' or 'right;' the jurisdiction of Texas courts—the very authority to decide cases—is conferred solely by the constitution and the statutes of the state." [79]

*Morales* represents the Texas Supreme Court's most recent substantive pronouncement regarding the limitations on equity jurisdiction to adjudicate challenges to penal enactments. And while *Morales* did not explicitly overrule any of the supreme court's prior precedents in that area, such as *Austin City Cemetery Association*, those authorities must now be viewed in light of the characterizations and analyses the *Morales* court has given them—and these serve to undermine appellees' proposed applications of those precedents.[80]

Given *Morales*'s apparent insistence that the relevant "irreparable injury to vested property rights" must flow from the actual or imminent enforcement of the penal statute against the claimant,[81] it is questionable whether the appellee businesses could ever meet the requirement, considering that the ordinances do not directly criminalize their trade in coolers or disposable containers. Relying on the same aspect of *Morales*, the *Morrow* court held that the fireworks company there could not, under color of *Austin City Cemetery Association*, challenge a county burn ban impacting only its customers.[82] But leaving aside this potential barrier to appellees, the upshot of *Morales* is that (1) the appellee businesses would have to demonstrate that the ordinances' enforcement against their customers has irreparably injured the businesses' vested property rights; (2) injury to any personal rights does not suffice; and (3) any perceived inability of the busi-

---

volved "injury to property" as the *Morales* court perceived it. The court's reference to "injuries" (in quotes) appears in the next sentence.

**76.** *See id.* (characterizing *Passel* as falling into this category).

**77.** *Id.* at 946.

**78.** *Id.* at 947.

**79.** *Id.* at 942.

**80.** Appellees' arguments parallel some themes from the *Morales* dissent. *See id.* at 949–51

(Gammage, J., dissenting) (accusing majority of "ignor[ing] the rule that an equity court's primary concern in enjoining a criminal statute is whether there is irreparable harm," urging "[t]hat issue—not whether property is involved—is and should be the overriding question," (citing *Logue*, 376 S.W.2d at 570, 572), and arguing that *Austin City Cemetery Association* "turned not on th[e] property interest, but on the inability of the party to obtain judicial review of an allegedly unconstitutional statute").

**81.** *See id.* at 943 n.6, 944 n.7.

**82.** *Morrow*, 230 S.W.3d at 240.

nesses to obtain remedy through criminal proceedings does not change that analysis. The appellee businesses cannot meet this standard for substantially the same reasons this Court identified in *Mr. W. Fireworks*.[83]

Nor have appellees even shown the degree of economic injury deemed significant by the Texas Supreme Court in *Austin City Cemetery Association* and *Decker*. Although appellees presented evidence that supported some of their pleading allegations, including evidence of economic loss, reduced sales, lost profits, reduced tourism on the rivers, and lost business opportunity,[84] the evidence was undisputed that the ordinances do not prohibit, in the manner seen in those cases, any of appellees from operating their businesses, including selling disposable containers or renting coolers.[85] While the evidence showed that some of appellees have decided to change the product mix that they offer, the ordinances do not prohibit—and do not have the practical effect of prohibiting—the operation of any of their businesses.[86] Rather, the ordinances are directed to others' personal rights: they are limited to prohibiting any person from taking certain items on the Comal and Guadalupe Rivers within the city limits, regardless of whether the items were purchased or rented from appellees.

■ While we recognize the businesses' frustration with the ordinances' economic impact upon them and the City's persistence in raising jurisdictional barriers to a merits-based resolution of their constitu-

---

83. *Mr. W. Fireworks, Inc.*, 2010 WL 1253931, at *7–8, 2010 Tex. App. LEXIS 2384, at *19–22.

84. Appellees' allegations in their pleadings included that STOP's "members have businesses that are uniquely dependent on the 'tubing and tourism' industry that is being negatively impacted by the ordinances"; the Outfitter Plaintiffs had been unable to sell their existing inventories in food and beverages in disposable containers, "thus causing a loss of the investment in existing inventories of the now-unmarketable items," "are effectively prohibited from selling food and beverages in 'disposable containers' to their customers that intend to consume such items in the Comal and Guadalupe Rivers within the City limits," "sustained a sharp, dramatic decrease in cooler rentals" causing "economic loss to the Outfitters in the form of rental revenues for coolers in stock," and "lost the value of their investments in coolers with a volume greater than 16 quarts"; the "Disposable Container Ordinance has significantly damaged or destroyed [the Outfitters'] market for food and beverage sales in 'disposable containers' to tubing customers within the City limits of New Braunfels"; the "Cooler Ordinance has restricted the use of Outfitters' property, caused them additional expense to purchase 'regulation size' coolers to rent, and destroyed the market for larger cooler rentals within the City limits"; and Tri-City Distributors, a wholesaler, had reduced sales and lost profits. In *STOP I*, we concluded that the allegations of "general economic impact from a decrease in tourism" did not confer standing because such an injury would be shared with other citizens of New Braunfels. *See* 306 S.W.3d at 930.

85. For example, when asked during his deposition if there were any products that he could not sell to customers that they could sell before the ordinance, a representative of Tri-City Distributors testified, "We can sell everything that we've always sold to the retailer. We just—our end consumer cannot take them in the river because that—they became illegal." A representative of Landa River Trips also testified in his deposition, that the company "basically phased [the larger coolers] out," that it no longer had any in stock, and that it now has an inventory of smaller coolers. As to items that the company sold in disposable containers, he testified that they still sell the same items but "less of them now," but that they also sell reusable containers now.

86. For example, a representative of Texas Tubes testified in his deposition that the company now sells non-disposable containers that it did not sell prior to the enactment of the Disposable Container Ordinance.

tional complaints, it remains that *Morales* is the law and that "[a]s an intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court unless and until the high court overrules them or the Texas Legislature supersedes them by statute."[87] Until then, we are compelled to hold that the district court lacked jurisdiction to entertain appellees' claims.

As an alternative basis to support the district court's subject-matter jurisdiction, appellees argue that their taxpayer standing supported the trial court's jurisdiction over their claims and that the City waived any challenge to the district court's jurisdiction on this basis by not raising or briefing the issue. Jurisdiction, however, cannot be waived.[88] Further, taxpayer standing represents an exception to the "general rule of Texas law" that a plaintiff show a particularized injury to establish his or her constitutional standing[89]—a jurisdictional requirement that is distinct and independent from the aforementioned jurisdictional limits on civil court's equity jurisdiction to address penal enactments.[90]

Because we conclude that the summary-judgment evidence conclusively established that the district court did not have subject-matter jurisdiction over appellees' claims, we must sustain the City's first issue and need not reach other issues it raises.[91]

**87.** *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.); *see Lubbock Cty. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) ("It is not the function of a court of appeals to abrogate or modify established precedent."). Similarly, it is solely the Texas Supreme Court's prerogative to decide whether *Morales* should be reexamined in light of recent broader developments in its jurisprudence. *See Patel*, 469 S.W.3d at 82–88 (emphasizing constitutional protections of economic rights); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (discussing "adequate remedy" in context of original mandamus proceedings and explaining that "operative word, 'adequate', has no comprehensive definition; it is simply a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts").

**88.** *See Good Shepherd Med. Ctr., Inc. v. State*, 306 S.W.3d 825, 837 (Tex. App.—Austin 2010, no pet.) ("[S]ubject-matter jurisdiction cannot be waived or conferred by agreement, and we have a duty to consider a question of subject-matter jurisdiction sua sponte because the district court's power to decide the merits, as well as our own, rests upon it." (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443–46 (Tex. 1993))); *see also Finance Comm'n of Tex. v. Norwood*, 418

S.W.3d 566, 580 (Tex. 2013); *Ex parte Springsteen*, 506 S.W.3d at 798 n.50.

**89.** *See Williams v. Lara*, 52 S.W.3d 171, 178–79 (Tex. 2001) (explaining that taxpayers fall under limited exception to "general rule of Texas law" that requires a plaintiff, unless standing is conferred by statute, to "demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury").

**90.** *Cf. Patel*, 469 S.W.3d at 77–79 (addressing, as distinct jurisdictional issues, challenges based on standing, ripeness, and redundant remedies doctrine); *Bray v. Fenves*, No. 06-15-00075-CV, 2016 Tex. App. LEXIS 5366 (Tex. App.—Texarkana May 19, 2016, pet. filed) (mem. op.) (contrasting court's subject-matter jurisdiction that concerns court's power to determine action involving particular subject matter and standing that concerns party's standing to bring claim). To the extent that our analysis in *STOP II* suggested otherwise, we clarify that taxpayer standing is an alternative means of satisfying constitutional standing requirements, not an alternative to the requirements *Morales* prescribes for bringing equitable or declaratory claims challenging penal enactments.

**91.** *See* Tex. R. App. P. 47.1. The City raised five additional issues that challenge the final summary judgment.

## CONCLUSION

Having concluded that *Morales* precludes the district court's subject-matter jurisdiction over appellees' claims, we must reverse the final summary judgment and render judgment dismissing appellees' claims for want of subject-matter jurisdiction.