In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00096-CV**
_____

**TRIPLE B SERVICES, LLP, Appellant**

**V.**

**CITY OF CONROE, Appellee**

**On Appeal from the 457th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-12-15498-CV**

**MEMORANDUM OPINION**

Appellant Triple B Services, LLC ("Triple B" or "Appellant") sued Appellee the City of Conroe ("the City" or "Appellee") to collect amounts allegedly owed under a construction contract. The City filed a plea to the jurisdiction asserting that governmental immunity barred the claim. After a hearing, the trial court granted the City's plea. Triple B appeals, raising two issues. In its first issue, Appellant argues that the trial court erred by allowing witness testimony and exhibits into evidence at the hearing on the plea to the jurisdiction, by weighing the merits of the lawsuit, and

by granting the City's plea. In its second issue, Appellant argues that immunity for breach of contract should be abrogated because "the process in which it is decided is being abused" and because *Federal Sign v. TSU*[1] was wrongly decided and should be overturned. As explained below, we affirm.

## Triple B's Original Petition

In Triple B's Original Petition, Triple B asserted claims against the City for breach of contract and violation of the Texas Public Prompt Pay Act[2] ("Prompt Pay Act") and also sought attorney's fees. According to the petition, the City awarded Triple B—an excavation, paving, and utilities contractor—a contract for the construction and widening of a stretch of Wilson Road ("the Project"), to be completed within 300 days after the work began. The petition also stated that the City awarded the Project to Triple B based on competitive bidding. Triple B's total bid for the project was $4,729,988.95. After the City notified Triple B that it had been selected to perform the work, the City and Triple B entered into a contract.

Triple B alleged in its petition that when it submitted its bid for the Project "it did not know (and could not know) that the three hundred [] day project schedule was not attainable because Conroe had failed to properly identify and timely remove existing utility line conflicts within Triple B's path of work." Triple B alleged that

---

[1] *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401 (Tex. 1997).
[2] *See* Tex. Gov't Code Ann. § 2251.001-.055.

2

the actual conditions were different than described in the bid documents and contract, that in the course of its work, Triple B was forced to deal with utilities in the right-of-way for most of the duration of the Project, and that Triple B could not have anticipated that the City would fail to identify existing utility lines and have the utilities timely relocated.

Triple B alleged that it submitted over sixty requests for information ("RFI") during the Project asking for instruction or clarification "due to the Conroe caused delays/impacts," and that the City acknowledged several times that Triple B was not responsible for the problems arising from the utility conflicts. According to Triple B, it completed its work on November 5, 2019—more than 267 days later than the originally-scheduled completion date of February 11, 2019. On March 3, 2020, Triple B submitted a claim to the City requesting an additional $515,072.54 for "cost impacts, delays, and disruptions" it incurred because of the unforeseen utility conflicts. According to the petition, the City denied the claim on April 4, 2020, and although Triple B continued negotiations with the City, the City failed to make full payment to Triple B for its work and materials on the Project.

Triple B alleged that the City breached the parties' contract by:

[] failing to pay Triple B in a timely manner as required by the Contract and/or by Texas law:
[] failing to properly plan and sequence the work under the Contract;
[] failing to properly provide access to Triple B's work under the Contract; and

3

[] failing to properly plan and sequence the work of others so as not to adversely affect Triple B's work under the Contract.

Triple B also alleged that the City violated the Prompt Pay Act by failing to pay Triple B no later than thirty days after payment was requested. Triple B also sought attorney's fees.

In the petition, Triple B alleged that the City waived sovereign immunity to suit because it had entered into a written contract with Triple B for the Project and the trial court had jurisdiction over the lawsuit under Chapter 271 of the Texas Local Government Code.[3]

### The City's Answer and Plea to the Jurisdiction

The City filed its answer and a plea to the jurisdiction on February 22, 2021. The City asserted a general denial and denied that certain conditions precedent required by the terms of the parties' contract had occurred, and:

> [] Even if Conroe had authorized or approved "extra work" beyond the scope of the Contract (which it denies) requiring a change order, Plaintiff failed to notify Conroe of its intention to seek additional compensation within ten (10) days of any such alleged directive. []
> [] Plaintiff failed to submit all close out documents prior to or with the Application for Final Payment. []
> [] Plaintiff failed to submit a claim to Conroe within thirty days after the start of an occurrence or event giving rise to the claim. []

The City cited certain provisions of the contract in support of its assertions. The City also pleaded as affirmative defenses sovereign immunity, plaintiff's prior material

---

[3] *See* Tex. Loc. Gov't Code Ann. §§ 271.151-.160 ("Chapter 271").

breaches, limitation of liability under the indemnification clause of the contract, waiver, and good faith dispute.

The City's plea to the jurisdiction included a copy of certain contract documents. The "Instructions to Bidders" document (the Instructions) stated that the contractor shall be compensated in a lump sum amount as shown in the contract, and the "lump sum amount includes complete compensation for all labor, equipment, materials or service which may be reasonably inferred from the Contract Documents as necessary to the completion of the intended work, regardless of whether or not specifically called for by the Contract Documents." The Instructions also stated that "[e]xtra work shall be authorized only through a written Change Order or Construction Change Directive approved by [the] City." The contract stated, "Change Orders are the exclusive method for modifying the Contract Sum or Contract Time." The contract executed by the parties provided for two types of change orders to change the scope of work or to adjust the Contract Sum or the Contract Time: an agreed change order jointly executed by the owner and the contractor, and a unilateral change order issued by the City. According to the City's plea to the jurisdiction, because Triple B's request for payment that is the subject of its claims is not an agreed change order nor one issued by the City, it is not a change order under the contract. The City argues that Triple B's alleged claim sought compensation beyond the contract lump sum amount and "Plaintiff's real complaint

5

is not that Conroe has failed to pay the Contract amount, but rather that its bid to complete the Work was too low and that it should have had more information before submitting its bid." The City argued that Triple B's claim was quasi-contractual because it was not a valid change order under the contract, and nothing in section 271.152 waives immunity to suit for implied or quasi-contractual claims.

The City also argued that it had not waived immunity from liability for the damages Triple B alleged had resulted from the City's "failure to identify existing utility lines and [] have utilities relocated in a timely manner." According to the City, the bid instructions provided that the contractor should "examine the site of work and fully inform themselves as to all conditions and matters, which can in any way affect costs" before submitting a bid and that submission of a bid was "conclusive evidence" that the contract had fully informed the bidder about all conditions and matters on the job site. Although the City acknowledged that immunity is waived for owner-caused delay damages,[4] the City argued that:

> Conroe was not contractually obligated to identify all existing utility lines; the burden was contractually placed on Plaintiff to submit requests for information, attend pre-bid meetings, perform an inspection of the job site, and request any additional documentation it needed to determine costs *before* submitting a bid. Plaintiff's failure to do so does not mean that any "unknowns" or unexpected events are somehow a wrongful act of Conroe giving rise to delay damages under the statute.

---

[4] Citing Tex. Loc. Gov't Code Ann. § 271.153(a); *Zachry Constr. Corp. v. Port of Houston Auth. of Harris Cty.*, 449 S.W.3d 98, 109-10 (Tex. 2014).

According to the City, to the extent that the additional payment Triple B sought was for lost profit, such damages would also be consequential damages that are expressly disallowed under Chapter 271.[5]

A hearing on the plea to the jurisdiction was set for April 1, 2021, and the Notice of Hearing was filed and served on Triple B on February 22, 2021. The City filed its list of exhibits the day before the hearing.

Triple B's Response to the Plea to the Jurisdiction

Triple B filed a response to the plea to the jurisdiction and it filed an amended response. Triple B argued that the City's plea to the jurisdiction should be denied because it was "an attempt to [] mischaracterize Triple B's damages as consequential damages sought under a quasi-contractual claim[]" and that the damages Triple B sought were "damages and costs that are contemplated in the Contract, and result[ed] from the City's delays and breaches of the Contract." According to Triple B, when it submitted its bid on the Project, it did not know and could not have known that the schedule was unattainable because the City had failed to identify and later failed to timely remove existing utility line conflicts in the path of work. Triple B asserted that it promptly notified the City about "the erroneous omission of the underground utility lines[,]" but the City failed to develop a solution, which the City was obligated to do under the contract. Triple B alleged that utility relocation issues "caused by the

_____

[5] *See* Tex. Loc. Gov't Code Ann. § 271.153(b).

7

City" caused the Project to be delayed and not completed until 267 days past the original completion date, and the claim Triple B submitted on March 3, 2020 "requested an adjustment for the costs, impacts, delays, and disruptions that Triple B incurred on the Project."

Triple B also argued that it was owed money by the City for the increased cost to perform the work resulting from the City's delays, that the damages it claimed were due and owed under the contract, and as such, its damages were within the statute and immunity has been waived. According to Triple B, section 271.153 waives governmental immunity for "owner-caused delays[,]"[6] which Triple B argued includes a broader scope of damages than ordinary delay damages. Triple B argued that the City caused the delays on this Project by its failure to provide adequate and complete information about utility lines. Triple B further argued that the damages it claimed in its petition were direct—not consequential—damages because they "'are the necessary and usual result of the defendant's wrongful act;

---

[6] Section 271.153(a)(1) of the Local Government Code provides that damages awarded against a local governmental entity for breach of a contract are limited to "the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration[.]" Tex. Local Gov't Code Ann. § 271.153(a)(1). Subpart (b)(1) also states that an award of consequential damages is not permitted, "except as expressly allowed under Subsection (a)(1)[.]" Id. § 271.153(b)(1).

they flow naturally and necessarily from'" the City's wrongful conduct.[7] Triple B also argued that the City's plea did not address Triple B's claim under the Prompt Payment Act.

Triple B attached to its response a copy of the parties' contract and the March 3, 2020 claim for payment of $515,072.54. The claim for payment itemized these costs:

| | |
|---|---|
| Supervisory Cost (Project Delay – Time Impact Analysis 2/15/19 to 11/01/19) | $232,021.76 |
| Certified Labor/Loss of production (due to conflicts/impacts) | $147,001.83 |
| Idle/Stby Equipment (due to conflicts/impacts) | $94,618.99 |
| Mobilization/Demobilization (due to conflicts/impacts) | $30,300.00 |
| Field Expenses (Project Delay – Time Impact Analysis 2/15/19 to 11/01/19) | $11,129.96 |
| Total Cost of Delay/Damages | $515,072.54 |

Hearing on the Plea to the Jurisdiction

Evidence

Chris Bogert testified for the City and stated that he worked for the City of Conroe as the City Engineer and was involved with the Project. Bogert testified that the City developed a set of plans for the Project and did an above-ground survey and subsurface exploration to try to locate utilities, but "[t]he problem with underground utilities is you can't find them because they're underground." Bogert testified that

_____

[7] Quoting *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144 (Tex. 2012).

9

the City made it very clear to Project bidders that they would likely encounter unknown underground utilities. Bogert further testified that Exhibit 4 was minutes of a preconstruction meeting between the City and Triple B, and he stated:

> . . . We made it very clear that we found all the utilities we could find above ground. We went an extra effort to find them underground. We coordinated with our public works group, who is responsible for the roads, water, sewer, and storm, and looked for even more lines. We [] told them we did everything we could do but we knew there were more lines in there that we couldn't find and we'd have to deal with them as we went through the project. On several occasions we mentioned that.

Bogert agreed that Exhibit 2 was the General Construction Notes for the Project, and because the City knew there were utilities it could not find, the Notes included these comments:

> [] All existing underground utilities are not guaranteed to be completed or definite, but were obtained from the best information available. Contractor has sole responsibility for field verification of all existing facilities as shown on drawings. Contractor shall coordinate all conflicts with the appropriate governing agencies.
> [] Location of all underground utilities shown are approximate only. The contractor shall request accurate location of these facilities by contacting respective utility companies, at least 48 hours prior to commencing work.
> . . .
> [] The contractor shall coordinate his/her construction activities with the utility companies as to the relocation of their facilities if needed.
> . . .
> The contractor is fully responsible for any damages caused by the contractor's failure to exactly locate and preserve these underground facilities.

Bogert testified that it was "quite common" for contractors to have to find underground utilities on city projects, particularly on rehabilitation projects. Bogert

10

agreed that the bid package included an instruction to "[i]ndicate any exceptions to the terms and conditions of this [Request for Proposal], including the Scope of Services. Include a copy of all amendments issued pertaining to this [Request for Proposal]." According to Bogert, the City found all the utilities it could, but because it knew there were more utilities, the contract included a payment item so "they would have moneys available to them to go and find more utilities[.]" Bogert agreed that Triple B's proposal for the Project stated it would charge $1,100 for each time it had to do subsurface utility exploration and another $25,000 contingency for utilities.

Bogert also agreed that the bid package required bidders to name all the subcontractors that would be used on the Project, but that Triple B did not list Burke Management, LLC, and in its final request for payment, Triple B requested about $193,000 in supervisory costs for Burke Management, LLC.

Bogert further agreed that the bid package included the following statement:

> Before submitting a bid the proposer shall examine carefully all contract documents including the form of the contract to be executed. In addition the proposer shall examine the site of the work and fully inform themselves as to all conditions and matters, which can in any way affect the costs thereof. The submission of a Bid shall be conclusive evidence that proposer has complied with this requirement.

Bogert agreed that the bid instructions stated that the contractor shall be compensated in a lump sum, which included compensation for all labor, equipment, materials, or service "which may be reasonably inferred from the Contract

11

Documents as necessary to the completion of the intended work, regardless of whether or not specifically called for by the Contract Documents." According to Bogert, the change order Triple B submitted about six months after completion of the Project was for work items "that were reasonably inferred from the contract documents." Bogert agreed that by the end of the Project, the City had paid Triple B about $260,000 as additional contract sums based on change orders.

Bogert agreed that the bid instructions provided that extra work would be authorized only through a written change order or a Construction Change Directive approved by the City and that the contractor shall notify the City of its intent to seek additional compensation within ten days of receiving such a directive. Bogert testified that under the contract, a change order may be agreed or unilateral, that an agreed change order must be jointly executed by the contractor and the City, and a unilateral change order is issued by the City without the contractor's agreement.

During direct examination of Bogert, the following exchange occurred:

[Counsel for the City]: . . . [W]ithin the bid proposal, within the drawings, within the contract documents, did the City repeatedly tell Triple B Services they needed to go find the utilities?

[Bogert]: Yes, sir.
. . .
[Counsel for the City]: . . . [T]his entire claim of Triple B, is it not about them wanting this additional compensation for what they claim were utility conflicts?

[Bogert]: Yes, sir.

12

[Counsel for the City]: And at any time, did they ever come to the City of Conroe for a change order for these alleged utility conflicts until some six months after the contract was completed?

[Bogert]: No, sir.
. . .
[Counsel for the City]: . . . [A]ll the stuff they're talking about in here -- and this is key. None of this stuff that they're talking about was a direct result of anything the City of Conroe did; was it?

[Bogert]: No, sir.

[Counsel for the City]: It was a result of Triple B running into unknown conflicts that were unknown to the City. Right?

[Bogert]: Yes, sir.

[Counsel for the City]: And is that something that they were advised about and even given contingency items for when they ran into those things within the contract?

[Bogert]: Yes, sir.
. . .
[Counsel for the City]: And so now, some six months later, Triple B wants to go back to the well and add another 515,000.

[Bogert]: Yes, sir.

[Counsel for the City]: Was any part of that a direct result of owner-caused delays or acceleration?

[Bogert]: No, sir.
[Counsel for the City]: Was any part of that for change orders or additional work the City instructed Triple B to perform?

[Bogert]: No, sir.

Bogert also testified that the March 2020 change order was not submitted within the time frame specified by the contract. Bogert agreed that under the contract, all claims

13

must be submitted in writing within thirty days of the event giving rise to the claim, and that Triple B did not do so. According to Bogert, Triple B's requests for payment during the Project included Conditional Waivers in which Triple B acknowledged that the release covered all progress payments for labor, services, equipment, or materials on the Project except for unpaid retention or pending modifications or changes and waived claims for any additional compensation or charges.

Bogert identified Exhibit 9 as an executed change order request for gas line removal for $3,255 and Exhibit 10 as an executed change order request for utility conflict contingency overage of $5,150. Bogert identified Exhibit 12 as an Agenda Submittal Form by the City dated September 2019 stating that the project was substantially complete and recommending payment of an additional $206,000 for overruns due to unforeseen conflicts and utility conflicts. Bogert identified Exhibits 14 and 15 as emails between Triple B and the City in which Triple B sought payment for extra expenses totaling $56,296.29, which Bogert testified the City paid to Triple B. According to Bogert, he was surprised when Triple B submitted an additional change order in March 2020 because the Project had been over for some time and the City believed that the previous change orders had "wrapped up" the Project. Bogert testified that the City did not direct the March 2020 change order, it did not sign it, and it did not agree to it. On cross-examination, Bogert agreed that the March 2020 change order was for costs that Triple B believed it was owed for delays

because of utility line conflicts. Bogert also agreed on cross-examination that the construction drawings for the Project did not show every single utility line and in some instances were incorrect as to underground utilities. Triple B did not offer any witnesses or exhibits at the hearing.

Trial Court Arguments and Ruling

At the hearing on the plea to the jurisdiction, the City framed the key issue as whether the amount claimed by Triple B was caused by the City or the direct result of something that the City caused Triple B to do. The City argued that before the bid was awarded, the City made it very clear that it did not know the location of the utilities and that it would be up to the contractor to "figure it out" before submitting its bid. According to the City, delays and damages from not knowing the location of the utilities were not owner-caused delays under the statute and were not caused by the City. The City argued that Triple B "ran into expected problems that the City told the contractor were going to arise[,]" and immunity was not waived under section 271.153. The City further argued that the contract does not require the City to tell Triple B where the utilities were located as Triple B had argued, the contract documents reflect that the City did not know where the utility conflicts were, and the City told Triple B it was Triple B that needed to locate the utilities. The City also argued that unless there is a waiver of immunity for the breach of contract claim,

15

there cannot be a waiver for Triple B's claim in the Prompt Payment Act, which depends on an underlying claim for breach of contract.

Triple B argued that it had pleaded sufficient facts to allow the trial court to rule on the plea and that the evidence the City intended to present was "inappropriate" and related to the merits of Triple B's claim. According to Triple B, under the contract, the City was obligated to provide utility conflicts to Triple B and in the event of inconsistencies, the City had to adjust the contract amount.

Triple B objected at times during the hearing that the testimony and evidence related to the merits of the case. The trial court stated on the record "I think this has to go towards the causation, anything caused by a direct result of the City of Conroe[.] . . . I think this is relevant information to go towards causation of any damages[,]" which was needed to see whether immunity had been waived.

After the hearing, the trial court signed an order granting the City's plea to the jurisdiction and dismissing the cause for lack of jurisdiction.

Issues On Appeal

In its first issue, Triple B argues that the trial court erred in granting the City's plea to the jurisdiction by allowing witness testimony without notice, allowing exhibit evidence with short notice, and by weighing the merits of Triple B's case. According to Triple B, the evidence the City submitted with its plea to the jurisdiction "was a direct attack on the merits of Triple B's claims[]" and went

16

"beyond the boundaries of jurisdictional inquiry[.]" Triple B argues that it did not receive adequate notice of the witness and exhibits the City planned to use at the hearing, that the testimony of Chris Bogert went to the merits of the case, specifically what might be a defense for the City at trial, and that his testimony "shed little light on the jurisdictional inquiry[.]" Triple B also argued that, the contract at issue met all the requirements of section 272.152 for a waiver of governmental immunity, and that, to the extent that the City argued that Triple B's claim was quasi-contractual and sought consequential damages, those legal arguments are for summary judgment or for trial. Triple B also asserts that its claim is for direct damages arising out of owner-caused delays, and such damages are covered by section 271.153(a).[8] Triple B further argues that it pleaded sufficient facts to demonstrate subject-matter jurisdiction and that the City did not challenge the allegations in Triple B's pleadings but only challenged Triple B's ability to recover. In its Reply brief, Triple B argues that the City's plea to the jurisdiction "did not challenge any pleaded jurisdictional facts, nor did it challenge the existence of jurisdictional facts." Triple B also argues that "[t]he trial court implicitly tried to make Triple B put on its case to establish jurisdiction and it considered and gave credit to evidence that was irrelevant to a plea to the jurisdiction."

---

[8] Citing to *Cty. of Galveston v. Triple B Services, LLP*, 498 S.W.3d 176, 185 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *City of Houston v. Allco, Inc.*, 238 S.W.3d 849, 850 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

17

In its second issue, Triple B argues that immunity for breach of contract should be abrogated because "the process in which it is decided is being abused" and because *Federal Sign v. TSU* was wrongly decided and should be overturned. According to Triple B, "the plea to the jurisdiction practice, as employed by governments, has taken on a life of its own[,]" and has resulted in interlocutory appeals and delays "in almost every single case[.]" Triple B asserts that "[a]lthough Texas courts have historically deferred to the Legislature on matters of immunity, it has been clearly observed that immunity is court-made common law and subject to being abrogated by the courts."[9] Triple B compares a plea to the jurisdiction filed by governmental entities to a general demurrer, which it argues "'led to innumerable reversals, interminable delays and unnecessary expense[]'"[10] and which has been abolished. In its Reply brief, Triple B argues that deference to the Legislature should not be "an abdication or acknowledgement [that] the Legislature is the authority on immunity." That said, Triple B acknowledges in its Reply Brief that abolishing governmental immunity from breach of contract lawsuits is beyond the reach of this Court.

---

[9] Citing *Tex. Dep't of Mental Health and Mental Retardation v. Petty*, 848 S.W.2d 680, 687 (Tex. 1992) (Cornyn, J., dissenting), and *Calhoun v. Pasadena Indep. Sch. Dist.*, 496 S.W.2d 131, 132 (Tex. App.—Houston [14th Dist.] 1973, writ ref'd, n.r.e.).

[10] Quoting *T.I.M.E., Inc. v. Md. Cas. Co.*, 300 S.W.2d 68, 72 (Tex. 1957).

Governmental Immunity: Standard of Review
and Applicable Law

Governmental units, including municipalities, are immune from suit unless the State consents.[11] There is a "heavy presumption in favor of immunity[,]" and a statutory waiver of sovereign immunity must be "clear and unambiguous[.]"[12] A plea to the jurisdiction challenges the trial court's subject-matter jurisdiction over a case.[13] We review the trial court's ruling on a plea to the jurisdiction under a de novo standard of review.[14]

When a plea to the jurisdiction challenges the existence of jurisdictional facts, a trial court's review "mirrors that of a traditional summary judgment motion."[15] The trial court must take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor.[16] If there is a fact issue on jurisdiction issue, the trial court must deny the plea.[17] But if the

---

[11] *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004)).

[12] *See* Tex. Gov't Code Ann. § 311.034; *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007).

[13] *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Pineda v. City of Houston*, 175 S.W.3d 276, 279 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

[14] *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998).

[15] *Garcia*, 372 S.W.3d at 635.

[16] *Miranda*, 133 S.W.3d at 228.

[17] *Id.* at 227-28.

evidence is undisputed or if the plaintiff failed to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law.[18] The plaintiff bears the burden to allege facts that affirmatively demonstrate that the trial court has subject-matter jurisdiction.[19] If a plea to the jurisdiction challenges the existence of jurisdictional facts, a court considers relevant evidence submitted by the parties to resolve the jurisdictional issues.[20] In a case in which the jurisdictional challenge also implicates the merits of the plaintiff's cause of action, the trial court reviews the relevant evidence to determine whether a fact issue exists.[21] If the governmental entity's evidence demonstrates that the plaintiff's jurisdictional allegations are not true, the burden shifts back to the plaintiff to offer evidence disputing the government's evidence.[22] If the evidence creates a fact issue on the jurisdictional issue, the trial court cannot grant the plea, and the fact issue must be decided by the factfinder.[23,24] But if the relevant evidence is undisputed or

---

[18] *Id*. at 228.

[19] *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

[20] *See Miranda*, 133 S.W.3d at 227.

[21] *See id.*

[22] *See Clark*, 544 S.W.3d at 805.

[23] *See Miranda*, 133 S.W.3d at 227-28.

[24] Because a trial court rules on a plea to the jurisdiction as a matter of law and it may not grant a plea to the jurisdiction if there are genuine issues of material fact regarding jurisdiction, findings of fact are not proper. *See Schmitz v. Denton Cty. Cowboy Church*, 550 S.W.3d 342, 352 (Tex. App.—Fort Worth 2018, pet. denied) (mem. op. on reh'g).

fails to raise a fact question in jurisdiction, the trial court rules on the plea to the jurisdiction as a matter of law.[25]

Analysis

It is undisputed that the City of Conroe is a "local governmental entity" to which Chapter 271 applies, and it is undisputed that the contract for the Project between the City and Triple B is subject to Section 271.152.[26] In this appeal, the parties' dispute is governed by the application of section 271.153[27] and the question we must decide is whether Triple B's March 2020 request for "additional compensation" was a claim for damages authorized under 271.153, which provides:

    (a)  Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

        (1)  the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

        (2)  the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;

        (3)  reasonable and necessary attorney's fees that are equitable and just; and

        (4)  interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

---

[25] *See Miranda*, 133 S.W.3d at 228.

[26] *See* Tex. Local Gov't Code Ann. § 271.152.

[27] *Id.* § 271.153.

    (b)   Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter may not include:

        (1)   consequential damages, except as expressly allowed under Subsection (a)(1);

        (2)   exemplary damages; or

        (3)   damages for unabsorbed home office overhead.

    (c)   Actual damages, specific performance, or injunctive relief may be granted in an adjudication against a local governmental entity for breach of a contract described by Section 271.151(2)(B).

Section 271.153 limits the damages in suits under 271.152. In *Zachry*, the Supreme Court held that "section 271.153, along with other provisions of the Act, 'define[s] the scope of [section 271.152's] waiver of immunity.'"[28] The subparts of the statute "define the scope of [chapter 271's] waiver of immunity[,]" and the chapter "does not waive immunity from suit on a claim for damages not recoverable under Section 271.153."[29] So, to invoke section 271.152's waiver of immunity, a party seeking damages must assert a claim for the limited damages set out in section 271.153.[30] Chapter 271 also does not waive immunity for quasi-contractual or quantum meruit claims.[31]

---

[28] *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 553 (Tex. 2019) (quoting *Zachry*, 449 S.W.3d at 108).

[29] *Zachry*, 449 S.W.3d at 108, 110.

[30] *City of Heath v. Williamson*, No. 05-20-00685-CV, 2021 Tex. App. LEXIS 3381, *5 (Tex. App—Dallas May 3, 2021, no pet.) (citing *Zachry*, 449 S.W.3d at 110-11 ("[Chapter 271] does not waive immunity from suit on a claim for damages not recoverable under Section 271.153.")).

[31] *See City of Willow Park v. E.S. & C.M., Inc.*, 424 S.W.3d 702, 712 (Tex. App.—Fort Worth 2014, pet. denied) ("[O]ur sister courts have uniformly held that section 271.152 does not provide for a waiver of immunity for quantum meruit

Triple B pleaded that the trial court had jurisdiction over the claim under Chapter 271 of the Local Government Code. It also pleaded that its March 2020 claim for payment "address[ed] the cost impacts, delays, and disruptions that Triple B incurred on the Project as a result of the unforeseen utility conflicts." Triple B's petition alleged that "Triple B could not have anticipated that Conroe would completely fail to identify existing utility lines and also have utilities relocated in a timely manner." According to Triple B, the March 2020 claim was for "costs incurred as a direct result of the[] owner caused delays on the Project."

In its plea to the jurisdiction, the City pleaded that the March 2020 change order is a request for additional compensation above and beyond the lump sum contract amount, and it was not an allowable change order under the contract because it was neither issued by the City nor agreed to by the City. According to the City, because the March 2020 claim was not valid under the contract, it is a quasi-contractual claim for which immunity has not been waived by statute. Citing the City's Request for Proposals for the Project, the City argued that Triple B was obligated to examine the work location and inform itself of all conditions and matters

---

claims and that entities retain immunity for such claims."); *Dallas Cty. Hosp. Dist. v. Hospira Worldwide, Inc.*, 400 S.W.3d 182, 187 (Tex. App.—Dallas 2013, no pet.) (concluding that "the waiver of immunity afforded under section 271.152 does not extend to [the appellant's] alternative claim for quantum meruit[]"). *See also Jackson v. Tex. S. Univ.*, 997 F. Supp. 2d 613, 648 (S.D. Tex. 2014) ("Texas courts have uniformly held that as a matter of law contract and quasi-contract claims such as promissory estoppel and quantum meruit are barred by sovereign immunity.").

that could affect costs before submitting its bid and that "[t]he submission of a Bid shall be conclusive evidence that proposer has complied with this requirement." The City further argued that it was not contractually obligated to identify all existing utility lines and that Triple B's failure to include additional costs for utility issues in its Project proposal is not a wrongful act by the City that would give rise to owner-caused delay damages under section 271.153.

At the hearing on the plea, the City offered the testimony of Chris Bogert, a City Engineer for Conroe. Bogert testified that before accepting Triple B's proposal for the Project, the City "made it very clear" to bidders that the City had done what it could to identify utilities conflicts and the General Construction Notes for the Project included notations that the marked locations of underground utilities were "approximate only" and that "Contractor has sole responsibility for field verification of all existing facilities as shown on drawings." According to Bogert, the bid instructions provided for the contractor to be paid in a lump sum for labor, equipment, materials, or service "which may be reasonably inferred from the Contract Documents as necessary to the completion of the intended work[,]" and that Triple B's March 2020 change order was for work items "that were reasonably inferred from the contract documents[]" and therefore included in the lump sum. Bogert also testified that because the City knew there were more utilities than the City itself found, Triple B's proposal for the contract included ten payments of

24

$1,100 for each time Triple B had to do subsurface utility exploration and another $25,000 contingency for utilities. Bogert testified that Triple B did not submit a change order for utility conflicts until about six months after the contract was completed. According to Bogert, the March 2020 claim for payment was not for work or costs that were a direct result of delays caused by the City, and it was not for additional work the City instructed Triple B to perform. Bogert testified it was for contingency items that should have already been provided for in the bid submitted by Triple B. Triple B did not offer any evidence at the hearing to rebut Bogert's testimony.

On this record, we conclude that the City presented evidence at the hearing that negated Triple B's jurisdictional allegations because the City established that the damages Triple B sought were not "due and owed" by the City under the contract and did not include "any amount owed" as compensation for increased cost to perform the work under the Contract as direct result of City caused delays or acceleration,[32] and the damages were not for "change orders or additional work" the contractor was directed to perform.[33] So the damages were not within the limitation set forth in 271.153.[34] At that point, the burden shifted back to Triple B to offer some

---

[32] Tex. Local Gov't Code Ann. § 271.153(a)(1).
[33] *Id.* § 271.153(a)(2).
[34] *See Clark*, 544 S.W.3d at 805.

evidence disputing the City's evidence.[35] Triple B offered no testimony or other evidence at the hearing on the plea to the jurisdiction, and it failed to dispute the evidence the City offered.

Triple B argues that the trial court considered the merits of the underlying claim when considering the City's witness testimony and exhibits, which went "far beyond a jurisdictional inquiry." In responding to this argument at the hearing, the trial court stated that the City's witness testimony and exhibits were relevant to determining subject-matter jurisdiction because they concerned whether the alleged delays were caused by the City, what kind of work was done before the contract, and the terms of the contract. We agree with the trial court. Section 271.153 limits the type of damages.[36] Whether Triple B's March 2020 claim sought damages as allowed under 271.153 was a threshold inquiry and part of the jurisdictional analysis for which the trial court was allowed to receive evidence at the hearing on the plea to the jurisdiction.[37]

---

[35] *Lubbock Cty. Water Control and Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 305 (Tex. 2014).

[36] *See* Tex. Local Gov't Code Ann. § 271.153.

[37] *See Miranda*, 133 S.W.3d at 227-28.

Appellant cites *County of Galveston v. Triple B Services, LLP* [38] and *City of Houston v. Allco, Inc.*[39] in support of its arguments. We find both cases distinguishable on the facts.

The *County of Galveston* case concerned a road-expansion project in which the County of Galveston had an express contractual obligation to move utilities, and this obligation was reflected in the original construction plan.[40] The trial court held that "at least some of Triple B's alleged damages appear to be the direct result of the County's delay in moving the utilities[.]"[41] In the *County of Galveston* case, the First Court concluded that some of the damages sought were damages "under the contract" and resulted from the County's delay in performing its contractual obligations, and that governmental immunity was waived,[42] and the court of appeals then affirmed the trial court's order denying the plea to the jurisdiction for Triple B's breach of contract claim and for interest under the Prompt Pay Act.[43] Unlike the

---

[38] 498 S.W.3d 176.

[39] 238 S.W.3d 849.

[40] *Triple B Servs., LLP*, 498 S.W.3d at 179-80.

[41] *Id.* at 185.

[42] *Id.* at 183-86. The Galveston County case involved governmental immunity under section 262.007 of the Local Government Code, which pertains to contracts with counties. *See* Tex. Local Gov't Code Ann. § 262.007. Section 262.007 has language similar to section 271.153 in that it permits recovery of damages that are "a direct result of owner-caused delays" but it also does not permit recovery of consequential damages. *See id.*

[43] 498 S.W.3d at 178, 190. The First Court reversed the trial court's order on Triple B's claim for attorney's fees because such damages were not a claim for which immunity had been waived. *Id.* at 189-90.

contract in *County of Galveston*, here the contract did not include a contractual provision requiring the City to relocate utilities. Additionally, here the City's undisputed evidence established that the City had made its final payment, had approved and paid some of requests for additional payment on utility relocations as the construction progressed and as provided under the City's contract documents, and the Project bid instructions reflected that it was Triple B's obligation to include within its bid the cost related to finding and relocating utilities.

As for the *City of Houston v. Allco, Inc.* case, it was an appeal of a final judgment after a bench trial.[44] Allco contracted with the City of Houston for sewer rehabilitation work.[45] During the work, certain residents who lived near the work filed a federal lawsuit related to earlier claims the residents had against Chevron for soil contamination.[46] A federal marshal served Allco with a temporary restraining order, ordering that it cease excavation work in the affected subdivision.[47] Ultimately, Allco bought and trucked in new dirt to refill trenches, which it believed it was required to do.[48] The City then sent Allco a letter demanding that it dispose of the excess excavated material and debris, and Allco sued the City seeking

---

[44] *Allco, Inc.*, 238 S.W.3d at 851-52.
[45] *Id.* at 850.
[46] *Id.*
[47] *Id.*
[48] *Id.*

damages for the cost of the extra work.[49] The trial court found that the parties'

contract provided for extra work, and that Allco's extra work was in response to the

City's directive.[50] On appeal, the First Court concluded that the damages Allco

sought were amounts due under the contract because a provision of the contract

permitted Allco to recover extra costs incurred resulting from the City's failure to

provide information.[51] The First Court held that the costs to test, move, and dispose

of contaminated soil constituted "extra work" and was a "balance due and owed by

[the City] under the contract" and authorized under section 271.153.[52] By contrast,

here Triple B has failed to point to any provision in the parties' contract that permits

it to recover the additional costs, the City's exhibits and testimony offered into

evidence at the hearing reflect that Triple B's bid on the Project already included

amounts for utilities conflicts, and the City had already paid Triple B for the Project

and for change orders properly submitted under the contract.

As to Appellant's complaints about the trial court receiving evidence at the

hearing, in Appellant's brief Triple B admits that "there are no 'procedural rules' for

plea to the jurisdiction hearings[.]" That said, Appellant complains it was not given

sufficient notice that the City intended to call Bogert as a witness and that it had no

---

[49] *Id.* at 851.
[50] *Id.*
[51] *Id.* at 853-54.
[52] *Id.* at 853.

29

notice of the exhibits the City intended to use at the hearing. "[T]he scheduling of a hearing of a plea to the jurisdiction is left to the discretion of the trial court, which is in the best position to evaluate the appropriate time frame for hearing a plea in any particular case."[53] The record reflects that the City provided notice of the hearing on February 22, 2020, more than a month before the date for the hearing. Although Appellant objects generally that it lacked sufficient notice of Bogert's testimony or the exhibits the City intended to offer, Appellant does not claim surprise by any evidence at the hearing nor did Appellant seek a continuance of the hearing so it could counter the testimony or present evidence. The City's exhibits included the bid instructions, the contract for the Project, the Construction Notes for the Project, change order forms executed by the City and Triple B from December 7, 2018 through August 19, 2019, and Triple B's Conditional Waiver and Release forms. Each of these documents had been provided to Triple B by the City or were executed by Triple B during the Project. Appellant also does not argue it was prevented from offering witness testimony or exhibits.[54] For these reasons, we reject Appellant's

---

[53] *Miranda*, 133 S.W.3d at 229.

[54] At the hearing, Triple B asked for an opportunity to supplement its response with an affidavit. The trial court stated that it would go ahead with the hearing and "we can re-address this issue after [] -- depending on what you do on your examinations and what you can and cannot get out." Triple B did not raise the issue again during the hearing, and it does not argue on appeal that the trial court denied Triple B an opportunity to supplement its response with an affidavit. The record does not include any supplemental affidavits from Triple B.

argument that the trial court erred in considering the evidence or testimony. We overrule Appellant's first issue.[55]

Request to Abrogate Immunity for Breach of Contract

In its second issue, Triple B argues that immunity for breach of contract should be abrogated because "the process in which it is decided is being abused" and because *Federal Sign v. TSU* was wrongly decided and should be overturned. Appellant failed to make the argument in the trial court that *Federal Sign v. TSU* should be overturned or that governmental immunity for breach of contract should be abrogated. So, Appellant failed to preserve error on this issue.[56] But even if Appellant had preserved error on this issue, we cannot rewrite the statute, nor do we have the authority to overturn or abrogate the holding in *Federal Sign v. TSU*.

The Texas Supreme Court has explained that "there is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature."[57] Recently, the Court also stated that "[w]e defer to the Legislature

---

[55] Appellant's Prompt Pay Act claim depends on its underlying breach of contract claim. Because we have already determined that immunity is not waived for Appellant's breach of contract claim, we need not separately analyze Appellant's claim under the Prompt Pay Act. *See* Tex. R. App. P. 47.1.

[56] *See* Tex. R. App. P. 33.1.

[57] *See Gen. Servs. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).

in waiving immunity because it is in a better position to weigh the conflicting public policy interests associated with subjecting the government to liability."[58]

"It is not the function of a court of appeals to abrogate or modify established precedent. That function lies solely with [the Texas Supreme Court]."[59] "'[A]s an intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court unless and until the high court overrules them or the Texas Legislature supersedes them by statute.'"[60] We overrule Appellant's second issue.

Having overruled both of Appellant's issues, we affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 24, 2022
Opinion Delivered July 14, 2022

Before Golemon, C.J., Kreger and Johnson, JJ.

---

[58] *See Dohlen v. City of San Antonio*, 643 S.W.3d 387, 392 (Tex. 2022) (citing *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 432-33 (Tex. 2016)); *see also Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006).

[59] *Lubbock Cty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) (citations omitted).

[60] *City of New Braunfels v. Stop The Ordinances Please*, 520 S.W.3d 208, 224 (Tex. App.—Austin 2017, pet. denied) (quoting *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.)); *see also Hauck v. Sabine Pilots, Inc.*, 672 S.W.2d 322, 323 (Tex. App.—Beaumont 1984), *aff'd*, 687 S.W.2d 733 (Tex. 1985) ("[A]s an intermediate court our duty is to follow the law as enunciated by our Supreme Court.").

32